**UNITED STATES of America, Plaintiff,**

v.

**Frank COSOLITO and Ralph Russo, Defendants.**

**Crim. No. 79–436–C.**

United States District Court, D. Massachusetts.

May 5, 1980.

---

**532**

Stanley E. Greenidge, Atty., U.S. Dept. of Justice, Crim.Div., Washington, D.C., for plaintiff.

John Wall, Harry C. Mezer, Cullen & Wall, Boston, Mass., for defendant Cosolito.

Frank A. Marciello, Jr., Somerville, Mass., for defendant Russo.

## MEMORANDUM

CAFFREY, Chief Judge.

This matter came before the Court on defendant Frank Cosolito's motion to dismiss a three-count indictment; an evidentiary hearing was held. The indictment charges that Cosolito and co-defendant Ralph Russo conspired to and, on December 9, 1974, gave money to two officials of the United States Internal Revenue Service in order to influence them to "fix" an outstanding tax liability of Cosolito, in violation of 18 U.S.C. § 201(b)(2) and 18 U.S.C. § 371. The indictment was returned by the grand jury on December 4, 1979, a few days before the five-year statute of limitations, 18 U.S.C. § 3282, was to expire, whereupon, on application of the government and by order of this Court, the indictment was sealed until February 4, 1980. Cosolito asserts two grounds for dismissal. First, he contends that the almost five-year delay between the commission of the crime and the return of the indictment violated his rights under the Due Process Clause of the Fifth Amendment. Second, he contends that the indictment was improperly sealed for a period beyond the statute of limitations.

After hearing, I find the relevant facts to be as follows. On December 9, 1974, defendant Cosolito had a meeting with Richard Annicharico, Special Agent, Internal Revenue Service, and Edward Finn, Revenue Officer, Internal Revenue Service, at a coffeeshop in Logan Airport, Boston, Massachusetts. At that time, Cosolito gave $3,500.00 to Annicharico and Finn in order to influence them to certify that an investigation into the tax liability of Cosolito for the years 1964 up to and including 1969, 1972, and 1973 was discontinued and that an outstanding liability to the United States of approximately $30,000 in unpaid taxes, penalties, and interest payments was extinguished. There was evidence that Cosolito generated the unreported income in illegal bookmaking activity. Annicharico, who was attached to the IRS office in New York, and Finn, who was attached to the IRS office in Boston, were posing as corrupt IRS agents.

Agent Annicharico testified that he first met defendant Russo at a meeting November 1, 1974 at an airport in New York City. That meeting was arranged by one John Ellsworth, a government informant. Ellsworth was present at the November 1 meeting, but sat down at a different table after introducing Russo and Annicharico. It appears that Russo was acting as an intermediary for Cosolito.

Agent Annicharico testified that he first met defendant Cosolito at a meeting held later in November at Logan Airport. Also present at that meeting were Agent Finn

and defendant Russo. Ellsworth was not present at that meeting.

After the December 9, 1974 meeting during which the bribe was made, Agent Annicharico had several more telephone conversations with Cosolito. Annicharico testified that these conversations were usually initiated by calls from Cosolito to Annicharico's office in New York. The last conversation took place in March of 1976. Annicharico stated that one purpose of the calls was Cosolito's desire to have a tax lien removed on his house. He also testified that there had been no mention of the tax lien until the December 9 meeting. A review of the transcript of that meeting reveals that Cosolito was informed by Agents Finn and Annicharico that although the liens would not be removed right away, they would be removed shortly thereafter since the cases were now closed. There was also testimony that Cosolito possibly had a second purpose for calling Annicharico—to introduce Annicharico to other persons seeking to have their tax problems solved. Annicharico testified that there was discussion at the December 9, 1974 meeting about Cosolito introducing Annicharico to friends who needed tax help, but it is unclear whether it was Cosolito or Annicharico who initiated this discussion. After that discussion, according to Annicharico's testimony, Cosolito called him in April of 1975 to arrange a tax fix for some "politician." From the transcript of that conversation, dated April 15, 1975, it appears that Cosolito made only a passing reference to this politician in response to a question by Annicharico as to whether Cosolito had any friends that needed help. Moreover, from the context of the conversation it appears equally likely that Cosolito misunderstood the question and was referring to a politician who could help him or his friends rather than a politician who needed help. In any event, the government has not convinced me that Cosolito attempted in any significant way to introduce other persons to Annicharico. And, I find that after March of 1976 he had no contact with Annicharico at all.

From December 1974 to June 1977, Agent Annicharico was not involved in any substantial undercover investigations, although he did testify he undertook some "spot work." Starting in June 1977, however, Annicharico became involved in an undercover capacity in an investigation in Brooklyn, New York. The Internal Security Division of the IRS had received information that one Victor Puglisi, negotiating on behalf of others, was seeking to offer a bribe with respect to a tax investigation then being conducted by the IRS in the New York area. Annicharico volunteered to pose as a corrupt government agent and, on or about June 21, 1977, met and tape recorded a conversation with Puglisi in which Puglisi asked Annicharico if he would compromise an investigation into tax violations by one Andrew T. Russo (not related to the defendant in this case). On January 12, 1978, Puglisi did in fact pay Annicharico some $7,000 to "fix" the Russo tax investigation.

Thereafter, Puglisi introduced Annicharico to many other individuals interested in compromising their tax liability, some or all of them members of a New York organized crime family. From June 21, 1977 to February 4, 1980, when the Brooklyn investigation ended, Annicharico tape recorded and/or transmitted in excess of five hundred conversations with Puglisi and those individuals to whom Puglisi introduced him. There is no question that Annicharico was dealing with extremely dangerous individuals and he testified that he has been under 24 hour protection since the Brooklyn investigation ended with the return of an indictment in February.

The person who first informed the IRS that Puglisi was interested in compromising a tax investigation was John Ellsworth. Ellsworth did not contact Annicharico directly but relayed the information to IRS Inspector Harold Wenig. Annicharico testified that Ellsworth was not present at the June 21, 1977 meeting between Annicharico and Puglisi.

Puglisi knew Annicharico had engaged in a corrupt deal in Boston. Annicharico testified that, over the course of his dealing

with Puglisi, Puglisi made it clear to him that he had learned of the Boston deal from Ellsworth. Although there was also testimony by Annicharico that Puglisi might have had an additional source, someone described as a "half-assed wiseguy" who Puglisi either met in Ellsworth's office or overheard Ellsworth telling that Annicharico did some deals in Boston, later testimony established, and I find, that this individual was not Cosolito or Russo.

With regard to Cosolito, Annicharico expressly testified that Cosolito did not introduce him to Puglisi, and that Cosolito's name never came up in his many discussions with Puglisi. Annicharico further testified that he had no knowledge that Cosolito knew Puglisi or any of the other subjects of the Brooklyn investigation. Annicharico also stated that he could not recall whether Cosolito knew Ellsworth. Cosolito himself took the stand and testified briefly that he had never met Ellsworth or the subjects of the Brooklyn investigation.

At the hearing, the government placed great weight on the transcript of a conversation between Annicharico and Puglisi, which occurred on August 30, 1977, as indicating that it was either Cosolito or Russo who told Puglisi about Annicharico. The relevant segment is as follows:

PUGLISI: John (phonetic) Johns (Inaudible)

ANNICHARICO: (Inaudible)

PUGLISI: (Inaudible) in his office over there, he had somebody up there, and said a half-assed wise guy.

ANNICHARICO: What office in the city?

PUGLISI: Yeah and I understand your name came up, did he ever ask you to come up (Inaudible) a guy from Boston?

ANNICHARICO: Yeah.

PUGLISI: That's (Inaudible)

ANNICHARICO: (Inaudible)

PUGLISI: See what I'm talking about, that's where it came from.

ANNICHARICO: (Inaudible) the guy made a mistake.

PUGLISI: See, he, he's the guy who told me about you.

ANNICHARICO: (Inaudible)

To the extent the above segment suggests that Puglisi learned about Annicharico from a guy in Boston, if indeed it is at all understandable, such a suggestion is not supported by Annicharico's direct testimony as to the same conversation:

Q And during the first part of that meeting, can you state whether or not Mr. Puglisi ever mentioned the city of Boston?

A Yes, he did, sir.

Q Okay.

When did he mention the city of Boston?

A Right at the beginning of the meeting, I would say.

We sat down and started some small talk and it seemed as though he was trying to impress me that he had looked into my background a little and he knew that I had done some deals in Boston.

Q Okay.

And what if anything did he say about Boston?

A He said that I met a guy up there in Boston.

Q Did he tell you how he knew you met a guy up there in Boston?

A Yes.

He heard of it in Mr. Ellsworth's office that I had been up in Boston to do a deal.

Q And did he mention anybody else he heard it from during that conversation?

A There was this unidentified person who he said, again, who talked around at Ellsworth's office about myself doing a deal in Boston and, of course, Mr. Ellsworth, I presume.

Based on Annicharico's direct testimony I find that the government had no factual basis on which to represent to the Court that either Cosolito or Russo informed Puglisi about Annicharico's deal in Boston.

Annicharico testified that he met the other subjects of the Brooklyn investigation through Puglisi, not through Ellsworth. There was also testimony from Attorney Joel Cohen of the Eastern District of New York Strike Force that Ellsworth was generally unaware that the investigation had branched out to other subjects.

The five-year statute of limitations was due to expire against Cosolito and Russo on December 9, 1979. In a letter dated November 26, 1979, Attorney Joel Cohen advised the Boston Office of the Strike Force that "the same undercover agent involved in your case, who held himself out as a corrupt agent, has been involved in a related undercover investigation with this Office for a period of approximately two and one half years." The undercover agent referred to is Agent Annicharico. The letter further advised that the investigation would continue for approximately two more months and warned that a public filing of an indictment would "disclose to the subjects of our investigation the true nature of their dealings with the undercover agent, i. e. they still believe he is corrupt and will realize he has been an undercover operative. This disclosure will arise from the fact that the informant who led the undercover agent to the subjects of your investigation is the same informant that led us, perhaps inadvertently, to the subjects of our investigation." The undercover informant referred to is John Ellsworth. Thus, the critical concern expressed in the November letter is that the disclosure of Ellsworth's status as an informant would lead in turn to disclosure of Annicharico's undercover status.

On December 4, 1979, the grand jury returned the three-count indictment against Cosolito and Russo. On December 5, Attorney Stanley Greenidge of the Boston Strike Force applied for an order, pursuant to Rule 6(e)(4) of the Federal Rules of Criminal Procedure, directing that the indictment be sealed until January 8, 1980. As reason therefore, the application stated that the case was "closely related" to the Brooklyn undercover investigation. The application advised that the public filing of the Cosolito and Russo indictment would disclose the

investigation in Brooklyn to the subjects of that investigation because "the same undercover agent was utilized in both investigations and the introduction of that undercover agent to the subjects of the New York investigation was accomplished by the defendants FRANK COSOLITO and RALPH RUSSO." The critical concern expressed in the application for sealing is different from that given in the letter from the New York office, in that the common link between the two investigations is stated to be defendants Cosolito and Russo, not the informer Ellsworth. The letter from Cohen was attached as an exhibit to the application.

The application for sealing was allowed on December 6, 1979. On January 8, 1980, when the order sealing the indictment was to expire, the Government applied for, and the Court allowed an extension of the order until February 4, 1980, the date when the indictment was ultimately unsealed.

Much of the evidence introduced by Cosolito at the hearing was directed toward establishing the status of John Ellsworth as a well-known government informant. Cosolito first introduced a tape of the ABC news program "20/20" broadcast on July 19, 1979. That particular broadcast devoted approximately twenty minutes to John Ellsworth, detailing his connection with a national swindle called the International Children's Appeal, a scheme to "rip off" the International Year of the Child which was stated to have "conned" such people as Rosalynn Carter and Senator Edward Kennedy. The "20/20" program also described Ellsworth's activities as a government informant. The following excerpts give the basic flavor of the commentary by reporter Dave Marash:

Make no mistake about it. John Ellsworth is an acknowledged federal informant and confidential sources tell us he has maintained close contact with representatives of at least two federal law enforcement agencies, the Drug Enforcement Administration, which admits he works for them, at least through last June, and the Justice Department, which

apparently took over paper responsibility for Ellsworth after that.

\*     \*     \*     \*     \*     \*

This may be the most astonishing part of his career. He's done this several times before. He has been a very important source of information for agencies of the federal government, and information that he has passed along has apparently helped the government build several major cases over the last five or six years.

Cosolito next introduced an article from the October 3, 1979 issue of the Long Island New York newspaper "Newsday" which identified Ellsworth as a government informant. The article reported the slaying of two mobsters which allegedly took place as a direct result of the "20/20" program exposing the International Children's Appeal and Ellsworth. Cosolito also introduced a copy of the "VIP" column from the December 2, 1979 issue of the Washington Post describing in great detail Ellsworth's activities. The following excerpt is particularly relevant:

> John Ellsworth does not like the word "informant." He prefers to describe himself as someone who has "cooperated" in the past with government investigators. He said he has "cooperated" at one time or another with the Secret Service, the Federal Bureau of Investigation, the Internal Revenue Service, the Drug Enforcement Agency, the Central Intelligence Agency and the Organized Crime Strike .Force in the Eastern District of New York. . . . The government has been making a lot of cases against Ellsworth's former friends and associates. Sixteen of them were indicted in New York in April on conspiracy charges involving marijuana, cocaine and hashish.

Finally, Cosolito introduced a copy of *United States v. Russo*, 540 F.2d 1152 (1st Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976), a case in which Ellsworth's name is prominently mentioned as an alleged government informant. The defendant in that case is Cosolito's co-defendant here and was convicted of crimes arising out of dealings with Ellsworth.

At the hearing, Attorney Joel Cohen conceded that he was aware of the exposure of Ellsworth as a government informant when he requested that the indictment be sealed.

■ I now turn to Cosolito's assertion that the preindictment delay in this case deprived him of due process. Although statutes of limitation provide the primary guarantee against overly stale criminal charges, the Supreme Court has held that the Fifth Amendment does have a limited role to play where the defendant can demonstrate actual prejudice and the government delay was unreasonable. *United States v. Lovasco*, 431 U.S. 783, 789–90, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 324–25, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). However, proof of actual prejudice is a "generally necessary" threshold requirement which must be satisfied before a court need inquire into the reasons for delay. *See Lovasco, supra*, 431 U.S. at 789–90, 97 S.Ct. at 2048; *United States v. Lieberman*, 608 F.2d 889, 902 (1st Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 673, 62 L.Ed.2d 649 (1979). Cosolito's only claim of prejudice is a conclusory statement that he can no longer remember how his tax liability was computed. Prescinding from the question whether that computation is even material to his present prosecution for bribery, I rule that Cosolito's alleged lack of memory, without more, is not sufficient actual prejudice to require further due process inquiry. *United States v. Ramos*, 586 F.2d 1078, 1079 (5th Cir. 1978). Therefore, Cosolito's motion to dismiss the indictment on Fifth Amendment grounds should be denied.

That leaves for resolution Cosolito's contention that the indictment was improperly sealed. Rule 6(e)(4) provides:

> "(4) Sealed Indictments.—The federal magistrate to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. Thereupon the clerk shall seal the indictment and no person shall disclose the return of the indictment except when

necessary for the issuance and execution of a warrant or summons."

Cosolito argues that Rule 6(e)(4) represents an exception to the statute of limitations and should be strictly construed. Therefore, defendant concludes, Rule 6(e)(4) only authorizes the government to seal an indictment in order to obtain custody of a defendant who otherwise might flee.

There have been few reported cases on the reasons for which the government may properly seal an indictment for a period beyond the statute of limitations. One case has suggested that the only valid reason for sealing is the one set forth in Rule 6(e)(4), that is, obtaining custody over the defendant. *United States v. Sherwood*, 38 F.R.D. 14, 20 (D.Conn.1964). Another case has held that the government may legitimately seal an indictment in situations where it is able to locate and gain custody over some, but not all, co-defendants named in an indictment. *United States v. Watson*, 599 F.2d 1149, 1155 (2d Cir. 1979). Still another case has suggested a much broader interpretation of Rule 6(e)(4), that the government may licitly seal an indictment for prosecutorial reasons other than gaining custody over a defendant or co-defendant. *United States v. Heckler*, 428 F.Supp. 269, 271–72 (S.D.N.Y.1976); *see also United States v. Michael*, 180 F.2d 55, 57 (3d Cir. 1949), *cert. denied*, 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1383 (1950).

■ The reasons set forth by the government in its application for sealing concededly have nothing to do with gaining custody over defendants Cosolito and Russo. I do not reach, however, the legal question whether the reasons given by the government in support of its request to seal would be valid reasons if factual, because after the evidentiary hearing I find those alleged reasons not to be factual and I rule therefore that the sealing authorized on the basis of misstatements as to the true facts was improper. As the court stated in *Watson, supra*, "even if the defendant shows *no* prejudice, delay in unsealing the indictment would be unreasonable if there were no legitimate prosecutorial need for it." 599 F.2d at 1156 n.4.

■ In finding no factual basis for sealing the indictment, I start with the specific reason stated by Attorney Greenidge in his application—that Russo and Cosolito were the common link with the Brooklyn investigation. I am satisfied by the evidence adduced at the hearing, and find, that the government knew that Cosolito and Russo did not introduce Agent Annicharico to the subjects of the Brooklyn investigation. Therefore I rule that the reason stated in the application was not in fact a proper basis for sealing. There remains the reason stated by Attorney Cohen in his letter of November 26, 1979—that exposure of informant John Ellsworth would prejudice the Brooklyn investigation. I find that, based on the television and newspaper reports described above and the opinion of the Court of Appeals in *Russo, supra*, the status of Ellsworth as a government informant must have been and in fact was common knowledge after July 1979 to anybody who had reason to take an interest in that matter. Therefore, I rule that the reason set forth in Cohen's letter was not a proper factual basis for sealing the indictment. Since I find that neither of the grounds asserted by the Government for sealing the indictment are supported by the evidence, the indictment should be dismissed.

It should be noted that, even assuming there was a relationship between the two investigations, the government as a practical matter created its own exigent circumstances which it claims required the indictment to be sealed. The government knew the full details of Cosolito's and Russo's criminal activity on the very day the bribe was paid and delayed indicting Cosolito and Russo on the vague hope that Cosolito would lead them to other subjects. For over two and one-half years after the bribe was paid, Annicharico was not involved in undercover activity and the government apparently had a complete case against Cosolito and Russo. Furthermore, the government has not attempted to demonstrate that there was any shortage of manpower to prosecute the case. *Compare United*

**538**

*States v. Shaw,* 555 F.2d 1295, 1299 (5th Cir. 1977). It was not until Annicharico coincidentally became involved in an undercover capacity in a separate and unrelated investigation that the alleged need for secrecy arose. To allow the government in these circumstances to extend the statute of limitations, even for a short period of time, would seriously undermine the role which statutes of limitations have traditionally served in protecting criminal defendants against the power of the government. *See United States v. Sherwood,* 38 F.R.D. 14, 20 (D.Conn.1964).

Order accordingly.