## UNITED STATES of America

### v.

**Abraham SLOCHOWSKY, Philip Holzer, David Gold, and Alvin Donnelly, also known as "Kenneth Aska", Defendants.**

## UNITED STATES of America

### v.

**Israel BILUS, Defendant.**

**Nos. CR–83–00178, CR–83–00180.**

United States District Court, E.D. New York.

Nov. 18, 1983.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for plaintiff; Max Sayah, Asst. U.S. Atty., Brooklyn, N.Y., of counsel.

Jacob R. Evseroff, Brooklyn, N.Y., for defendant Abraham Slochowsky.

Gerald L. Shargel, New York City, for defendant Philip Holzer.

Hoffman Pollok & Gasthalter, New York City, for defendant David Gold; Jeffrey C. Hoffman, New York City, of counsel.

Robert H. Kiernan, New York City, for defendant Israel Bilus.

BARTELS, District Judge.

Between April 27 and May 25, 1983, the grand jury returned five related indictments against eight defendants charging violations of the mail fraud statute, 18 U.S.C. § 1341, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* (RICO). The five indictments resulted from an investigation into arson-for-profit schemes in the New

York metropolitan area. At the Government's behest each indictment was sealed upon its return and all five were unsealed on July 12, 1983. Defendants Holzer, Gold and Bilus move to dismiss various counts of their indictments as time-barred on the ground that they were improperly sealed. Holzer and Gold also seek dismissal be-cause of pre-indictment delay in violation of their due process rights. The following table indicates the relevant dates and the relationships among the defendants appearing in the sealed indictments, all of which are crucial to an understanding of the legal issues.

| Defendants by Indictment | Indictment Returned and Sealed | 5 Years from Last Alleged Mailing [1] | | Indictment Unsealed |
|---|---|---|---|---|
| CR–83–00178:<br>Slochowsky<br>Holzer<br>Gold<br>Donnelly | 4–27–83 | 5– 3–83<br>5–26–83<br>6– 1–83<br>5–19–83<br>5–31–83 | (Ct. 2)<br>(Ct. 4)<br>(Ct. 5)<br>(Ct. 6)<br>(Ct. 7) | 7–12–83 |
| CR–83–00179:<br>Katkin<br>Slochowsky | 4–27–83 | | | 7–12–83 |
| CR–83–00180:<br>Bilus | 4–27–83 | 5–26–83<br>6– 1–83 | (Ct. 1)<br>(Ct. 2) | 7–12–83 |
| CR–83–00217:<br>Srulowitz | 5–11–83 | | | 7–12–83 |
| CR–83–00233:<br>Elliot<br>Slochowsky | 5–25–83 | | | 7–12–83 |

As the third column of the table indicates, the five-year statute of limitations (provided for in 18 U.S.C. § 3282) ran as to seven counts in two indictments while the indictments were under seal, thereby setting the stage for the defendants' claim that those counts are time-barred. To properly assess this claim, hearings were held at which Assistant United States Attorney Max Sayah testified as to the Government's reasons for requesting sealing. The facts adduced at the hearings are as follows: [2]

The United States Attorney's Office for the Eastern District of New York began its investigation leading to the instant indictments when contacted in November, 1982 by Joseph Bald, the Government's principal witness and an unindicted co-schemer.

Bald, already serving an 8⅓ to 25 years sentence for arson in Queens County, offered to testify concerning members of a large scale arson-for-profit ring in which he was a participant, as well as political corruption and securities fraud. After he received numerous threats while staying at the Metropolitan Correctional Center, the Justice Department placed Bald in the Federal Witness Protection Program in February, 1983. The press had reported rumors of Bald's cooperation and Bald believed, according to Sayah, that these threats originated with the defendants herein.

Bald's codefendants in the Queens arson case were James Blackwell and Alvin Donnelly (a/k/a "Kenneth Aska"), both of whom were fugitives from sentences of 8⅓

---

**1.** Counts 1 and 3 of CR–83–00178, as well as all counts in the indictments for which dates are not given, are not challenged as time-barred because the statute of limitations expired post-unsealing.

**2.** Incorporated into the record of that hearing are three affidavits previously submitted by Mr. Sayah in opposition to the instant motions. One of those Mr. Sayah had proffered ex parte and only if the court ordered its sealing. The court declined to accept the ex parte affidavit, at which time it was withdrawn.

to 25 years. In February or March of 1983 Donnelly and Blackwell contacted Sayah by telephone from an unknown location and offered to testify against the targets of the instant indictments and others in hope of negotiating a reduction of their state sentences. Sayah thereafter contacted the Queens County District Attorney's Office for that purpose, but the District Attorney opposed any sentence reduction. He did agree, however, to the surrender of Donnelly and Blackwell to federal authorities and their plea of guilty to a single count of mail fraud carrying a five-year sentence and to their continuing in federal custody for the remaining three and one-third years of their minimum state sentences.

This agreement between the two prosecutors served as the basis for negotiation between Sayah and the two fugitives over the next several months. In the course of approximately twenty telephone calls from Donnelly prior to April 27th, Sayah told Donnelly that he too was a target of the grand jury's probe into arson-for-profit and faced a possible RICO charge carrying a maximum twenty-year penalty. On the other hand, Sayah told them that if they surrendered at that time they would only be charged with mail fraud and not RICO violations and that they could serve their Queens sentences in federal prison.

At no time were Donnelly's and Blackwell's whereabouts known or discovered, although efforts were made to do so. At least on one occasion a specific surrender date was agreed upon and an attorney hired by Donnelly and Blackwell for that purpose (Kenneth Ramseur) called Sayah promising his clients' surrender. In anticipation of their surrender a complaint charging mail fraud was prepared. By April 27th, however, neither Donnelly nor Blackwell had surrendered and a bench warrant was issued against Donnelly who was charged, along with Slochowsky, Holzer and Gold, in a seven-count mail fraud and RICO indictment returned that day and sealed at Sayah's request. Blackwell was

not indicted because, according to Sayah, the evidence against him was insufficient.

Sayah feared that disclosure of the indictment would reduce or "chill" Donnelly's willingness to surrender because it would eliminate his expectations of pleading guilty to a one-count mail fraud indictment and of serving his minimum state sentence in federal custody. The elimination of such expectations of Donnelly would place Sayah in a weaker position to bargain for Donnelly's surrender since the penalties facing Donnelly would then be far more severe. Naturally, Sayah was particularly concerned with obtaining Donnelly's cooperation because he was an "invaluable" witness as the "torch" of the arson-for-profit rings.

As to defendant Bilus, Sayah also testified that he had believed that disclosure of Bilus' separate indictment (not naming Donnelly) likewise would have impeded his efforts to "entice" Donnelly into surrendering. Donnelly allegedly also was the "torch" for the buildings which were the subject of Bilus' indictment for mail fraud. These same buildings were among the larger group of buildings included in the indictment against Donnelly and his three codefendants. Based on his experience as a prosecutor, Sayah felt that disclosure of the case against Bilus involving buildings "linked" to Donnelly would also hamper his efforts to secure Donnelly's surrender.

Donnelly, Blackwell and their lawyer contacted Sayah numerous times between April 27th and July 12th to further discuss surrender. Sayah did not disclose the existence of the five sealed indictments and did not misrepresent to Donnelly that he had *not* been indicted. Approximately two months after the first indictments were sealed, Sayah lost hope that Donnelly and Blackwell would probably surrender in the near future. Thus, on July 5th Sayah contacted the attorneys for Slochowsky, Gold, Holzer, Bilus, Katkin and Elliott to inform them of the sealed indictments and to have their clients appear in court for unsealing

and arraignment on July 12th. At all relevant times the Government knew the whereabouts of these defendants and at no time did it fear that any of them would flee upon disclosure of the indictments.

The only other defendant deserving special mention is Srulowitz whose separate indictment did not name Donnelly. Sayah testified that Srulowitz's whereabouts were unknown prior to and at the time of his separate indictment on May 11th, on which date a magistrate signed an arrest warrant for him. Based on information from Bald the authorities believed that Srulowitz was in Israel or would flee there if still in the United States. Sayah therefore instructed agents of the Bureau of Tobacco, Alcohol and Firearms to locate Srulowitz. Later, in a telephone conversation in mid-June, Donnelly told Sayah that Srulowitz was living in Monsey, New York. Agents subsequently located him there, apparently without contacting him. Because the Government was not aware of any counsel retained by Srulowitz, an agent telephoned Srulowitz on July 5th and informed him to have counsel contact Sayah. This was done, and Srulowitz appeared in court with counsel on July 12th for unsealing and arraignment.

Soon after July 12th Donnelly again contacted Sayah once or twice and, according to Sayah, "vented his rage" about his indictment for a RICO violation. Following one and a half months of no contacts, Donnelly and Blackwell have recently resumed occasional telephone contact with Sayah, but both remain fugitives.

Thus, the Government presented three distinct reasons for sealing and keeping sealed the indictments. First and foremost, the Government feared that disclosure of the indictments would foreclose any chance of Donnelly and Blackwell surrendering and cooperating. As of April 27th, Donnelly stood indicted on one RICO count and six mail fraud counts carrying a total maximum penalty of fifty years imprisonment if given consecutive sentences. Second, until mid-June the Government believed that Srulowitz was in Israel and would not return if publicly indicted or would flee to Israel if in the United States. Third, the Government desired to keep the extent of Bald's cooperation secret until all the indictments had been returned and also to protect Bald against further threats.

## DISCUSSION

### I

### Sealing and the Statute of Limitations

The five-year federal statute of limitations, 18 U.S.C. § 3282, is the primary safeguard of the defendant's interest in avoiding a stale prosecution. *United States v. Muse*, 633 F.2d 1041, 1043 (2d Cir.1980) (*en banc*), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981). Rule 6(e)(4) of the Federal Rules of Criminal Procedure,[3] which permits the sealing of an indictment until a defendant is in custody, reflects the Government's interest in preventing "the requirement of an indictment from serving as a public notice that would enable the defendant to avoid arrest." *Muse*, 633 F.2d at 1043. These two interests occasionally collide when, as here, an indictment is returned and sealed prior to the expiration of the limitations period and unsealed after the period has expired.

In resolving this conflict the courts have upheld the Government's power to maintain an indictment under seal beyond the limitations period, based on "the legitimate prosecutorial needs of the

---

**3.** Rule 6(e)(4) of the Federal Rules of Criminal Procedure provides:

The federal magistrate to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial.

Thereupon, the clerk shall seal the indictment and no person shall disclose the return of the indictment except when necessary for the issuance and execution of a warrant or summons.

Government to capture those properly indicted for criminal activity." *Id.; see United States v. Michael,* 180 F.2d 55 (3d Cir. 1949), *cert. denied,* 339 U.S. 978, 70 S.Ct. 1023, 94 L.Ed. 1883 (1950). Accordingly, courts have permitted sealing beyond the limitations period where the Government feared that disclosure of the indictment and arrest of one defendant would cause codefendants whose whereabouts were unknown to flee. If the Government cannot demonstrate such a prosecutorial need, the expiration of the statute of limitations prior to unsealing would invalidate the indictment as in any case where an indictment is untimely filed. *See United States v. Watson,* 599 F.2d 1149, 1156 n. 4 (2d Cir.1979), *modified sub. nom., United States v. Muse,* 633 F.2d 1041 (2d Cir.1980) *(en banc ), cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981). Otherwise, the statute of limitations would be meaningless. If there is a legitimate prosecutorial need for the sealing, the defendants, to be entitled to dismissal, must be able to demonstrate actual prejudice occurring between the date of the sealing and the date of the unsealing.

In *Muse* an indictment against four individuals for narcotics conspiracy was filed five months prior to expiration of the five-year limitations period and was sealed because only defendant Muse's whereabouts were known and the Government feared that his arrest would prompt his co-conspirators to flee. The indictment was unsealed approximately sixteen months later when two of Muse's co-conspirators were located and arrested. Muse sought dismissal on the ground that he had suffered prejudice because of the long delay between the date of the offense charged and the unsealing of

the indictment. The court held that the relevant time frame for assessing claims of prejudice is "no longer than the time between the sealing of the indictment and its unsealing." *Id.* at 1042.[4] Defendant Muse was unable to demonstrate that prejudice had occurred during the sealing period and the court affirmed his conviction.

In the present case there is no claim of prejudice in connection with the two and one-half months during which the indictments were sealed. Rather, the claim is that the Government at no time had a legitimate prosecutorial interest in sealing the indictments. In *Muse* the court upheld the sealing on the ground that the Government had a substantial prosecutorial interest in sealing the indictment because of the need to capture Muse's codefendants. Equally significant, the court noted with apparent approval the district court's finding "that the Government acted in good faith, with a reasonable basis for estimating the effect of Muse's arrest on the other defendants." *Id.* at 1044.[5]

*Donnelly's Surrender*

■ In this case the court finds that the Government had a good faith, reasonable basis for believing that disclosure of the Holzer-Gold indictment would have seriously impeded the Government's ongoing efforts to induce Donnelly's surrender. The delicate negotiations between Donnelly and Sayah hinged upon Sayah's promise that Donnelly would be charged with a lesser charge (one count of mail fraud carrying a five-year penalty) and serve his federal and state sentence in a federal prison in exchange for his surrender and cooperation. Disclosure of the Holzer-Gold indictment, naming Donnelly as a codefendant, would have completely undermined Sayah's nego-

4. The court left undecided whether the relevant time frame for assessing claims of prejudice is further limited to the post-limitations portion of the sealing period. *See United States v. Muse,* 633 F.2d 1041, 1042 (2d Cir.1980) *(en banc ), cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981).

5. This finding was also noted by the three-judge panel which had reversed defendant Muse's conviction on grounds of prejudice. *See United States v. Watson,* 599 F.2d 1149, 1153 (2d Cir. 1979), *modified sub nom., United States v. Muse,* 633 F.2d 1041 (2d Cir.1980) *(en banc ), cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981).

tiating posture. These negotiations continued after the sealing on April 27th, and when Sayah concluded that Donnelly probably would not surrender the indictments were disclosed after eleven weeks under seal, not an unreasonably lengthy period under the circumstances.

■ Similarly, the court finds that the Government had a good faith, reasonable basis for refusing to disclose the Bilus indictment describing properties linked to Donnelly's arson activities since it would have deterred Donnelly's surrender. Specifically, disclosure of the Bilus indictment might have increased Donnelly's apprehension that he would be indicted on charges far greater than a single count of mail fraud as promised by Sayah.

Bilus stresses that his separate indictment does not name Donnelly and relies on a *dictum* in *Muse* that the Government would have been "hard put to justify" sealing there had Muse, whose whereabouts were known, been the sole defendant named in the indictment. 633 F.2d at 1044. That *dictum,* however, is solely addressed to cases involving a single indictment and is inapposite to cases involving multiple, related indictments. Rule 6(e)(4) does not expressly provide for sealing when the whereabouts of codefendants cannot be ascertained, yet, as in *Muse,* the courts have permitted sealing under such circumstances. To hold otherwise with respect to related indictments is thus neither mandated by Rule 6(e)(4) nor consistent with the rationale relied upon in *Muse.*

The failure to obtain Donnelly's surrender may cast some doubt upon the utility of sealing in this case. The reasonableness of the sealing, however, should not be gauged by hindsight, but should be viewed in the contemporaneous context of the "cat-and-mouse" game being played between Sayah and Donnelly. So viewed, the court is not prepared to substitute its judgment for that of an experienced prosecutor that disclosure of the indictments would significantly decrease the likelihood of Donnelly surrendering.

*Locating Srulowitz*

■ The court also finds that the Government acted reasonably and in good faith in requesting sealing based on the need to take Srulowitz into custody. Efforts to locate Srulowitz were made even prior to his indictment on May 11, 1983, and, based on information from Bald, it was believed that Srulowitz either was in Israel or would flee there if indicted. Srulowitz's separate indictment charged him with mail fraud and RICO violations involving properties which were also subjects of the Holzer-Gold and Bilus indictments. The Government thus had reason to fear that disclosure of those two indictments would cause Srulowitz to remain a fugitive. Srulowitz was not located until mid-June upon information from Donnelly.

*Protection of Bald*

■ We must reject the Government's third reason for sealing, concealing the extent of Bald's cooperation and protecting him from further threats. Such a purpose does not constitute a legitimate prosecutorial need within the purview of Rule 6(e)(4), which is directed solely to the Government's need to take a defendant into custody. Although courts have differed on this issue, *see United States v. Cosolito,* 488 F.Supp. 531, 537 (D.Mass.1980), this court is of the view that Rule 6(e)(4) circumscribes the Government's power to seal an indictment. *See Muse,* 633 F.2d at 1043; *United States v. Sherwood,* 38 F.R.D. 14, 20 (D.Conn.1964), *aff'd sub nom., United States v. Doyle,* 348 F.2d 715 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965).

*Defendants' Authorities*

In support of their motions defendants rely upon *United States v. Cosolito, supra; United States v. Heckler,* 428 F.Supp. 269 (S.D.N.Y.1976); and *United States v.*

*Sherwood, supra.* In *Cosolito* the court dismissed an indictment sealed for a period extending beyond the statute of limitations. The sealing did not concern obtaining custody of any defendant, rather, the reason given was that the defendant and a codefendant were a common link with another investigation. The court found no factual basis for this claim, and did not reach the issue of whether that reason would be legally sufficient to justify sealing. In *Heckler,* the court based dismissal on both pre-indictment delay and improper sealing, all the defendants being available. It found that disclosure of the indictment would not have affected an on-going investigation involving third parties. 428 F.Supp. at 271. Finally, in *Sherwood* the indictment was initially sealed because two of the four codefendants were overseas. It was further maintained under seal for an additional eleven months after they returned from abroad in order to evaluate a third defendant's claim with respect to an alleged promise of immunity from criminal prosecution. Under these circumstances the court dismissed the indictment. Obviously, these cases are inapposite to the present case because here the Government had a legitimate prosecutorial need to obtain custody over Donnelly throughout the sealing period and over Srulowitz for most of that period.

## II

### Pre-Indictment Delay

■ Holzer and Gold also move for dismissal of their indictment because of pre-indictment delay. Such a claim is grounded in the Due Process Clause of the Fifth Amendment. Upon this ground defendants must not only demonstrate that the Government engaged in unjustifiable conduct causing the delay, but must also show actual prejudice to their right to a fair trial. *United States v. Elsbery,* 602 F.2d 1054,

1059 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979); *see United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971); *United States v. Hodge,* 556 F.Supp. 139, 141 (S.D.N.Y.1983). Holzer and Gold assert that the Government intentionally delayed filing the indictment for almost five years in order to gain a tactical advantage resulting from defendants' loss of memory and consequent lessened ability to prepare a defense. Defendants offer no evidence to support this general, conclusory charge of intentional delay and prejudice.

■ The prosecutor's uncontradicted affidavit reveals that the indictment could not have been filed sooner than it was. It was not until November, 1982 that Bald contacted the United States Attorney for the Eastern District of New York, thereby triggering the investigation that led to the instant indictments. At that time Bald's cooperation with other federal and state authorities became known to the Eastern District prosecutor. The indictments were returned approximately six months later, not an unreasonable amount of time given the scope of the investigation. Thus, defendants cannot possibly demonstrate that the Government delayed prosecuting this case in order to gain a tactical advantage. Any delay between commencing the investigation and return of the indictments qualifies as good faith investigative delay which, even if it causes some prejudice, does not violate the Due Process Clause. *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

In sum, the court concludes that the defendants have failed to establish either improper sealing or undue preindictment delay which would justify a dismissal of the indictments. Therefore, defendants' motions are denied.[6]

SO ORDERED.

---

6. Defendant Slochowsky did not originally move to dismiss any of the three indictments

naming him on either of the two grounds raised by Holzer and Gold and discussed herein.

Upon his oral motion, however, the court permitted Slochowsky to join Holzer's and Gold's joint motion with respect to Indictment No.

CR–83–00178. Accordingly, Slochowsky's motion is also denied for the same reasons.